**City of Chicago, Appellant, v. Helena Heffron, Appellee.**

**Gen. No. 45,598.**

Opinion filed March 18, 1952. Rehearing denied March 31, 1952. Released for publication April 1, 1952.

JOHN J. MORTIMER, Corporation Counsel, of Chicago, for appellant; L. LOUIS KARTON, Head of Appeals and Review Division, and JOHN L. STEFFENS, Assistant Corporation Counsel, both of Chicago, of counsel.

JOHN F. O'CONNELL, and LEON M. DESPRES, both of Chicago, for appellee; SAMUEL D. GOLDEN, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

A complaint by the City of Chicago, filed in the municipal court on December 21, 1950, charged defendant with maintaining a home for aged persons without obtaining a license, in violation of section 136–2 of the Municipal Code of Chicago. Trial by jury resulted in a verdict for defendant. Plaintiff's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, was overruled, and judgment was entered on the verdict. The city appeals.

The essential facts disclose that the defendant, Helena Heffron, for many years has resided in a two-story brick home of sixteen rooms and four baths, located on an acre lot in a residential section of Beverly Hills in Chicago. During a considerable part of her residence there she has operated, for profit, an establishment for the care of men and women of advanced years, which she listed in the Chicago Telephone Directory of June 1950 as the Beverly Hills Rest Home. Two physicians attached to the medical staff of the Board of Health who had examined her home on December 6, 1950, indicated the ages of the residents as follows:

Rose Schmidt........................... 86
Marie Cole............................. 78
Julia Moore............................ 93
Alice Nelson........................... 83
Eleanor Larabie........................ 97
August Home............................ 88
Anna Kiest............................. 83
Ernest McLain.......................... 94

They found that two of these persons were almost blind, one was deaf, one had a tumor on her knee, one was incontinent, and one was scarcely able to move about without support. They were not only aged, as that term is commonly used, but, with one exception, all appeared infirm. All these persons paid defendant between eight to ten dollars per day, in return for which they were provided with room, meals, linen and maid service. In addition to the eight people referred to, defendant and her mother also lived in the house. Two, and sometimes three, servants who did not live on the premises, attended to the cooking, cleaning and general care of the establishment. It is conceded that all the residents have sufficient financial means of their own so that they are not dependent upon public charity

or private philanthropy. Defendant files annual reports with the Illinois State Lodging House Department, but is not licensed to conduct a "home" for the aged or infirm. There was considerable evidence as to the state of health of these various persons at the time they were admitted, and as to their daily habits and activities.

The question presented is whether defendant operated a home for the aged or infirm, as defined in section 136-1 of the Municipal Code of Chicago, without a license as required in section 136-2, or whether she maintained a boardinghouse, as she contends, which was not subject to the provisions of the code. The pertinent part of section 136-1, defining an establishment for the aged as a home, reads as follows: "A 'home' is further defined to mean any institution used for the reception or care of persons who are dependent or not capable of properly caring for themselves, and shall be understood to include homes for the aged or infirm, orphan asylums, half-orphan asylums, refuges, and shelters." Section 136-2 requires all persons, with certain well defined exceptions not applicable to the circumstances of this case, to obtain a license before conducting such a home.

It is urged by defendant that the Supreme Court of Illinois, in *Father Basil's Lodge, Inc. v. City of Chicago,* 393 Ill. 246, has construed the ordinance in question adversely to the city's contention. Plaintiff there sought to restrain the city from enforcing the ordinance and another ordinance defining and providing for the licensing and regulation of "Nursing Homes," claiming that the city was without authority, either express or implied, to pass the ordinances, and that they were therefore invalid; or, if the city did have power to pass them, that these particular ordinances were unreasonable and discriminatory and deprived plaintiff of its property without due process of law.

It was also contended that in any event the ordinances were not applicable to a home such as plaintiff operated. Father Basil's Lodge was a nonprofit corporation organized for the purpose of providing homes for aged and enfeebled persons. It maintained the Sunset Harbor Rest Home for aged men receiving pensions under the Old Age Assistance Act of Illinois. The home was located at 5749 Woodlawn avenue in Chicago in a reconverted two-story brick building originally used as a private residence. At the time suit was brought, approximately twenty-five men were living in the home. They had been referred there by the Department of Public Welfare of Cook county; all of them received old-age pensions which they turned over to the home, in return for which they were furnished with their board, lodging and other necessities. The men all performed domestic duties and housework incident to the maintenance of the home; they made their own beds, scrubbed, dusted, washed dishes and served as waiters at the table.

Defendant interprets the *Father Basil* case as limiting the ordinance in question to persons financially dependent upon state charity or private philanthropy, and since the persons in her home have adequate means to pay for their care, she contends that the ordinance does not apply to the kind of home she conducts. In fact her counsel go further "and quite easily infer that if the Court had not limited the ordinance to institutions whose residents are financially dependent, the attack for unconstitutionality would have been upheld." We think that case is not susceptible of so narrow an interpretation, as is clearly shown by the lengthy discussion in the opinion at pages 258 and 259, wherein the court, after stating the well settled principle that ordinances must be uniform, fair and impartial in their operation, reasonable and not arbitrary, and without discrimination against persons of

the same class, specifically pointed out that "an ordinance is not void because it discriminates against an individual or group, or because it affects one class and not another. (*Hansen v. Raleigh,* 391 Ill. 536.) . . . A classification contained in a statute or ordinance is never unreasonable or arbitrary when there is some basis for the differentiation between the classes or subject matters included as compared to those excluded from its operation, provided such differentiation bears a reasonable relation to the purposes to be accomplished by the act. . . . A legislative classification may rest on narrow distinctions. (*German Alliance Ins. Co. v. Lewis,* 233 U. S. 389.) It is not required to be scientific, logical or consistent. (*Hansen v. Raleigh,* 391 Ill. 536.) But the distinction must always have a reasonable basis when considered with reference to the purposes of the legislation. (*Marallis v. City of Chicago,* 349 Ill. 422.) The differences upon which classification may be exercised depend necessarily upon the object in view; and what would serve for a classification for some purposes may furnish no reason whatever for a classification for other purposes. (12 Am. Jur. 157, sec. 482.) A city, under its police power to provide for the protection of the health, lives and safety of its inhabitants, may enact legislation affecting only one particular class of inhabitants, and such classification is not discriminatory if there is some fair reason for the application of the law to the class affected which does not also require with equal force its application to others whom it leaves untouched. The lawmakers and the courts have always recognized that the poor and indigent, for some purposes, constitute a separate and distinct class, requiring the State or a municipality, in the exercise of the police power, to enact legislation for their relief and protection." It should be noted that the inmates in the *Father Basil* case were characterized as

253

aged *and* financially dependent, and that the term "aged" was there applied to men ranging in age from sixty-five to seventy-eight. The court was limited to the particular facts presented, and in construing the ordinance it did not go beyond the specific problem of that particular case. "It is not the policy of this court," so it stated, "to decide questions beyond the necessities of the immediate issue." The licensing of a home for aged or infirm persons with means to pay for their board, lodging and necessary incidentals was not before the court in the *Father Basil* case. It is significant that in commenting "upon the object in view" for the classification in this and the nursing-home ordinance the court said: "The ordinances involved in the case now before us are unquestionably health and safety regulations enacted for the purpose of promoting the health and protecting the safety of the inmates of the institutions affected by the ordinances by guarding such inmates from exposure to disease, impairment of health and the dangers of fire. It being clear that the health, safety and welfare of the inmates of such institutions would be subserved and protected by the ordinances in question, the same are therefore police regulations within the power of the city to enact and enforce under the authority expressly granted by sections 5, 70, 72, 81, 105, and 106 of article 23 of the Revised Cities and Villages Act."

Defendant attempts to join the terms "aged" and "infirm" into one category. It is self-evident that a person could be infirm without being aged and thus be a dependent person requiring the protection of the ordinance and come within its provisions regardless of age. Therefore the "infirm" would seem to constitute a class apart from the "aged," just as do the "poor"; and, of course, a person could conceivably fall within all three classes.

██ Manifestly the ordinance here in question was enacted to protect the health and safety of persons living in homes such as the one defendant maintains and operates; one method of implementing and enforcing the purposes of the ordinance is to provide for licensing and inspection. Various classes of persons require such protection; this ordinance by definition has named these classes, one of which is specifically designated as "aged or infirm" persons. The mere fact that they have adequate means to pay for their care should not disqualify them from the protection intended and afforded by enactment of the ordinance.

Defendant employs the disingenuous device of enumerating "some living and recently deceased persons of international renown," including Winston Churchill, Mahatma Gandhi, George Bernard Shaw, Dr. Albert Schweitzer, Arturo Toscanini and Albert Einstein, and asserts that they "could never be called 'aged' although they attained far beyond the sixty-eight year demarcation set by the plaintiff here." In *Allen v. Pearce*, 101 Ga. 316, 28 S. E. 859, the question before the court was whether a man sixty-six years old, though hale and hearty, was entitled to an exemption of his property from levy and sale under the constitutional provision allowing that right to "every aged or infirm person." The court indicated the complexity of the solution with the observation that "it would be difficult to designate an exact period of life when one might with certainty be said to have become aged," but added that it was safe to hold that a sixty-six year old man, even though hale and hearty, was entitled to the exemption. Certain classifications made for the welfare of society have, for practical purposes and of necessity, to be somewhat arbitrary. Some men and women retain their physical well-being and mental vigor far beyond the biblical life span of three-score

255

years and ten; but in this country, life insurance companies, industry, labor unions and Government have rather tacitly agreed on the age of sixty-five as a retirement age, and in the field of social legislation and social work it is customary to think of people as "aged" after they have attained this age. Certainly, after sixty-five, people are as individualistic as ever; conversely, as a group, they show certain definite characteristics. The eight inmates of defendant's home, ranging in age from seventy-eight to ninety-seven, with an average age of eighty-eight, are to be considered "aged," as are also the outstanding individuals whom defendant has enumerated. Chronologically, they are "aged"; biologically, they are "aged"; this is not to deny that they have retained their brilliance and acquired a mellow wisdom, but brilliance and wisdom cannot stop the passing of the years nor act as a bar to the usual physical degeneration that accompanies old age. If defendant's cosmopolitan group were residents of such a home, it intrigues the imagination to contemplate the scintillating conversations that would go on within its walls; but, prosaically, their health, their safety and their welfare would have to be subserved and protected by ordinance in the same manner as those of lesser or even no renown.

■ ■ As we read the record, the evidence indicates that defendant was operating a home for the aged or infirm as defined in section 136–1 of the Municipal Code of Chicago, and therefore the trial court should have held, as a matter of law, that she was operating a home for the aged or infirm without a license, as required by section 136–2, and entered judgment in favor of the city notwithstanding the verdict. The ordinance provides for a minimum and a maximum fine for each offense; since the case was tried by jury, it will be necessary for the jury to assess the fine. Accordingly, the judgment of the municipal court is reversed, and the cause is remanded with directions

256

that the case be submitted to the jury for the sole purpose of determining the fine to be assessed against defendant.

*Judgment reversed, and cause remanded with directions.*

BURKE, P. J. and NIEMEYER, J., concur.