**FRIENDSHIP MEDICAL CENTER, LTD., and T. R. M. Howard, Plaintiffs,**

v.

**The CHICAGO BOARD OF HEALTH et al., Defendants.**

**No. 73 C 1965.**

United States District Court, N. D. Illinois, E. D.

Nov. 16, 1973.

Jenner & Block, Chicago, Ill., for plaintiffs.

Richard L. Curry, Chicago Corp. Counsel, Chicago, Ill., for defendants.

## OPINION

AUSTIN, District Judge.

Plaintiffs brought this suit for alleged violations of 42 U.S.C. § 1983,[1] seeking an injunction against enforcement, and a declaration of unconstitutionality, of the 1973 Abortion Services Regulations promulgated by the Chicago Board of Health.[2] The case is presently before this court to resolve the questions raised by defendants' joint motion to dismiss the complaint. The alleged facts are as follows:

Plaintiffs are a medical corporation and a physician who own and operate an abortion clinic in Chicago. They challenge certain aspects of the Regulations for Abortion Services adopted and promulgated by defendants Chicago Board of Health, Oldberg (its president), and its members. Generally, the regulations are safety measures which prescribe the methods and conditions under which abortions may be performed, regardless of the duration of the patient's pregnancy.[3] They also require the filing of a registration form by any facility in which abortions are performed, containing facts indicating compliance with all the rules.[4] If an abortion clinic fails to register or otherwise comply with the regulations, the Board of Health may order the discontinuance of operation until the clinic is registered or the violations corrected.

Plaintiffs claim the abortion regulations violate the United States Constitution in that: (a) they unduly restrict the rights of abortion patients to personal and marital privacy as established by the First, Fourth, Fifth, Ninth and Fourteenth Amendments; (b) they deny equal protection of the laws; (c) they violate the procedural and substantive due process guarantees of the Fifth and Fourteenth Amendments; and (d) they are overbroad and vague in violation of the due process clauses of the Fifth and Fourteenth Amendments.

Plaintiffs further claim that the regulations violate the Illinois Constitution in that: (a) they violate the right to privacy set forth in Article 1, Section 6; (b) they violate the due process and equal protection clauses of Article 1, Section 2; and (c) they violate the right to remedy and justice under Article 1, Section 12.

Lastly, plaintiffs claim the regulations unlawfully infringe upon their right to engage in the diagnosis and treatment of human ailments, by restricting their right to diagnose the "disease" of pregnancy and to properly treat it by aborting it, in that (a) they require the registration of abortion clinics with the Board of Health; (b) they require that the performance of abortions be only in clinics registered with the Board of Health; (c) they require that an abortion clinic have an ambulance service to transport an abortion patient in an emergency to a hospital within a total transport time of 15 minutes, and that it have a writen affiliation agreement with the hospital so the latter will accept abortion patients in need of follow-up emergency care; (d) they require a period of 24 hours between the initial examination and the termination of pregnancy; (e) they require a pathological examination of all tissue removed from the uter-

---

1. 42 U.S.C. § 1983 reads as follows:
 "Every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. A three-judge panel has not been assembled in this case because the statute in question is one with only local application—i. e., a municipal regulation. See Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); Mitchell Family Planning, Inc., v. City of Royal Oak, 335 F.Supp. 738, 740 (E.D.Mich.1972).

3. The regulations are reproduced in Appendix A to this opinion.

4. The registration form is reproduced in Appendix B to this opinion.

us of an abortion patient; and (f) they impose other improper conditions which plaintiffs fail to specify. Plaintiffs assert these conditions are unrelated to the reasonable and vital needs and interests involved; that they are unrelated to the extent to which the subject pregnancy may be in the first trimester thereof; and that they are therefore unconstitutional.

The precise questions presented here are: (a) whether this court has subject-matter jurisdiction of this suit; (b) whether plaintiffs have standing to litigate all the constitutional issues presented in their complaint; (c) whether this case is moot; and (d) whether the complaint states a claim upon which relief may be granted under 42 U.S.C. § 1983, in light of the recent decisions of the Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

### JURISDICTION

Subject-matter jurisdiction of the instant suit is alleged to rest upon 28 U. S.C. § 1331,[5] which confers upon this court the power to adjudicate federal constitutional questions in which the amount in controversy exceeds $10,000, exclusive of interest and costs. In support of their allegation of jurisdiction, plaintiffs claim the amount in controversy exceeds the $10,000 figure.

Defendants move to dismiss, asserting that mere allegation that the amount in controversy exceeds $10,000 does not by itself give a court jurisdiction under § 1331. Rather, further allegations of fact from which the amount can be inferred must be made. They argue that since plaintiffs do not make such additional allegations, the jurisdictional amount cannot be considered to exist.

Therefore, they conclude this court lacks jurisdiction.

■ The object of this suit is to enjoin the enforcement of, and to declare unconstitutional, a municipal regulation. It is becoming increasingly recognized in cases where such relief is sought, that the amount in controversy is the value of the benefit which will be conferred upon the plaintiff if he prevails. *See* C. Wright, Law of Federal Courts § 34 at 117 (2d ed. 1970). Stated another way, the amount in controversy in a suit to enjoin a regulatory law is the cost to the plaintiff if he is forced to obey that law. *See* McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1934).

■ The abortion regulations in the present case require plaintiffs to maintain certain conditions and equipment at their clinic, and to hire certain personnel. Plaintiffs allege neither what the cost of compliance with the regulations will be nor that they will not incur the expenses unless so required.[6] Thus, the amount in controversy in the instant suit is far from certain. However, such certainty is not required, absent evidence contrary to the plaintiffs' jurisdictional allegations, to prevent dismissal. The rule governing dismissal for want of jurisdiction is that the sum claimed by the plaintiff to be in issue controls if apparently made in good faith. "It must appear to a *legal certainty* that the claim is really for less than the jurisdictional amount to justify dismissal." St. Paul Mercury Indemnity Co. v. Red Cab Company, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1937) (emphasis added). There being no evidence that plaintiffs' jurisdictional allegations were made in bad faith, and there being an insufficient basis upon which to conclude to a legal certainty

---

5. 28 U.S.C. § 1331 provides in pertinent part:

 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

6. If plaintiffs will make these expenditures regardless of the regulations, it can hardly be said that there is *any* amount of money in controversy.

that, as a result of the abortion regulations, plaintiffs' expenses will be increased by less than $10,000, defendants' motion to dismiss for lack of subject-matter jurisdiction must be denied.

## STANDING

In support of their motion to dismiss, defendants argue that plaintiffs lack standing to question the constitutionality of the abortion regulations. For the following reasons, their argument must be rejected in part; and therefore the motion to dismiss is granted only in part.

### A. The Issue of Privacy

■ The question presented here is whether a private physician has standing to seek injunctive and declaratory relief against municipal health regulations, because they allegedly violate his patients' rights to personal and marital privacy. In other words, may a physician bring an action on behalf of his patients to protect *their own* fundamental constitutional rights, if they themselves are able to assert and protect their rights in the courts without his aid? Although one distinguished Court in this District has held in the affirmative on this issue, *see* Doe v. Scott, 321 F. Supp. 1385, 1387–1388 (N.D.Ill.1971), I cannot agree for the following reasons.

■■ In order to assert a particular issue, it is established beyond all doubt that the plaintiff must have standing to do so. Furthermore, the doctrine of standing has come to require a twofold inquiry: first, whether the dispute at hand represents a "case of controversy" under Article III of the Constitution so it will be presented in an adversary context in a form historically viewed as capable of judicial resolution; and second, whether the litigant has a personal stake or interest in the outcome of that controversy. Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The first inquiry goes to the jurisdiction of the court to entertain the question presented, and the second is a

rule of self-restraint which precludes a person from challenging the constitutionality of state action by invoking the rights of others. Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L. Ed. 1586 (1953). An exception to this second rule is that a party may assert the rights of others where "it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court." *Id.* at 257, 73 S.Ct. at 1035.

In the present case, plaintiffs seek to have the abortion regulations declared unconstitutional and to enjoin the Chicago Board of Health from enforcing the regulations on the ground that they unduly restrict the rights to personal and marital privacy. Surely, this is a "case or controversy" within the meaning of Article III. But whose rights are asserted here? Clearly, they are not those of the individual plaintiff. Rather, they are the rights of his patients who are not parties to this suit. Moreover, plaintiff Howard does not purport to claim his own right to privacy is violated. Therefore, plaintiffs are asserting the rights of others in this case; and there is absolutely no reason why the patients cannot seek redress of alleged violations of these rights themselves if they so choose.

As far back as Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943), the Supreme Court recognized that a physician may not assert the rights of his patients in an action to declare a state anti-birth control statute unconstitutional as applied to him, saying:

"The sole constitutional attack upon the statutes under the Fourteenth Amendment is confined to their deprivation of life—obviously not appellant's but his patients. There is no allegation or proof that appellant's life is in danger. His patients are not parties to this proceeding and there is no basis on which we can say that he has standing to secure an adjudication of his patients' constitutional right to

life, which they do not assert in their own behalf." *Id.* at 46, 63 S.Ct. at 494.

To be sure, the Court has distinguished its holding in *Tileston* on several occasions. For example, in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), Mr. Justice Douglas, stating the Opinion of the Court, said:

"We think that appellants have standing to raise the constitutional rights of the married people with whom they had a professional relationship. Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603, is different, for there the plaintiff seeking to represent others asked for declaratory judgment. In that situation we thought that the requirements of standing should be strict, lest the standards of "case and controversy" in Article III of the Constitution become blurred. Here those doubts are removed by reason of a *criminal conviction* for serving married couples in violation of an aiding-and-abetting statute. *Certainly the accessory should have standing to assert that the offense which he is charged with assisting is not or cannot constitutionally be a crime.*" *Id.* at 481, 85 S.Ct. at 1679. (emphasis added).

Likewise, in Eisenstadt v. Baird, 405 U.S. 438, 443–447, 92 S.Ct. 1029, 31 L.Ed. 2d 349 (1972), the Court held that a person convicted of a statute prohibiting (1) distribution of contraceptives to married couples for the purpose of preventing pregnancy, and (2) distribution of contraceptives to single persons for any purpose, had standing to assert the denial of equal protection of the laws to single persons. Again, the Court in *Eisenstadt* was quick to point out the fact that Tileston v. Ullman does not deny standing to assert the rights of others where the person making such assertions has been convicted of a crime created by an unconstitutional statute, saying:

"This factor decisively distinguishes Tileston v. Ullman, 318 U.S. 44, 63 S. Ct. 493, 87 L.Ed. 603 (1943), where the Court held that a physician lacked standing to bring an action for declaratory relief to challenge, on behalf of his patients, the Connecticut law prohibiting the use of contraceptives. The patients were fully able to bring their own action. . . . " *Id.* at 443, n. 4, 92 S.Ct. at 1033.

Cf. Roe v. Wade, 410 U.S. 113, 123–127, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 186–189, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); (doctor had standing to sue on his own behalf and on behalf of others similarly situated for alleged violations of his own constitutional rights.)

It is concluded, therefore, that plaintiffs lack standing to assert the abortion regulations of the Chicago Board of Health violate the right to privacy. Accordingly, those portions of the complaint containing such assertions are dismissed.

### B. *The Remaining Issues*

Plaintiffs also claim the abortion regulations: (a) deny them the equal protection of the laws; (b) violate the procedural and substantive due process guarantees of the Fifth and Fourteenth Amendments; (c) violate the due process clauses of the Fifth and Fourteenth Amendments in that they are overbroad and vague; (d) violate the right to remedy and justice of Article 1, Section 12 of the Illinois Constitution; and (e) infringe upon their rights to engage in the diagnosis and treatment of human ailments by restricting their right to diagnose and treat medical matters relating to abortions.

It is apparent from these allegations that plaintiffs present a "case or controversy" concerning the constitutionality of the abortion regulations. It is further apparent that the rights allegedly violated are those of the plaintiffs. They therefore have standing to litigate the above issues; and defendants' motion to dismiss for lack of standing must be denied.

## MOOTNESS

█ In further support of their motion to dismiss, defendants submit a registration form filled out by plaintiffs in compliance with the abortion regulations and a letter from the Board of Health stating that plaintiffs' service meets the minimum standards of the regulations. They argue that as a result of such approval, plaintiffs' case is now moot. This argument must be rejected, however, in view of the fact that the regulations have a continuing regulatory effect on the plaintiffs. Accordingly, this case is not moot; and defendants' motion to dismiss on grounds of mootness is denied.

## THE MERITS

█ The substantive question presented here is whether a municipal board of health may constitutionally prescribe the conditions and environment in a clinic where abortions are performed, and prescribe the facilities to be provided therein. Both parties argue the merits of this issue under Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In both cases, the Supreme Court held, in substance, that a woman's decision to continue or terminate her pregnancy is a fundamental right of marital privacy, protected by the Fourteenth Amendment, and the doctrine of substantive due process; and therefore, infringement of that right by the state is lawful only if it has a "compelling interest" to do so.

Defendants, of course, assert that the abortion regulations are health measures which affect only the *safety* of a woman *after* she has decided to terminate her pregnancy. They argue that her decision to abort is unfettered by these health regulations, and that therefore, they are not prohibited by *Wade* and *Bolton*. Plaintiffs, on the other hand, point to the language in Roe v. Wade, *supra*,[7] and argue vociferously that *any* restriction on a physician's decision to terminate a pregnancy in its first trimester constitutes an unlawful infringement of his patient's marital privacy.

I am of the opinion, however, that because plaintiffs do not have standing to claim the abortion regulations unduly infringe upon the privacy of their patients, and because that issue has been dismissed from the case, the principles enunciated in Roe v. Wade, *supra,* and Doe v. Bolton, *supra,* are inapposite to the substantive question presented above. Accordingly, other decisions will be looked to in order to resolve this issue.

### A. *Federal Constitutional Questions*

Plaintiffs claim the Chicago abortion regulations violate their rights to due process and equal protection, and that the regulations are overbroad and vague, in violation of the Fifth and Fourteenth Amendments.

7. In Roe v. Wade, 410 U.S. 113, 163, 93 S. Ct. 705, 732, 35 L.Ed.2d 147 (1973), the court said: "With respect to the State's important and legitimate interest in the health of the mother, the "compelling" point, in the light of present medical knowledge, is at approximately the end of the first trimester . . . . It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facilities in which the procedure is to be performed, that is, whether it must be a hospital or maybe a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.

"This means, on the other hand, that, for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State."

### 1. *Substantive Due Process and Equal Protection*

■ It is beyond dispute that a state has broad power to establish and enforce standards of conduct for the purpose of protecting the health of everyone within its boundaries. It is a vital part of its police power. Moreover, a state's discretion in that field extends naturally to the regulation of all professions concerned with health. Barsky v. Board of Regents, 347 U.S. 442, 449, 74 S.Ct. 650, 98 L.Ed. 829 (1954); Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1954). *See also* Eisenstadt v. Baird, 405 U.S. 438, 465–472, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (Burger, C. J., dissenting.) Quite logically, when it has been properly delegated by the state,[8] such power may be exercised on the local level as well. *See* Father Basil's Lodge v. City of Chicago, 393 Ill. 246, 252, 65 N.E.2d 805 (1946).

■ In terms of equal protection and due process, the test of whether a city has properly exercised the police power in the area of health regulation is whether the action in question bears some rational relationship to a legitimate governmental interest.[9] Recent decisions, however, have established an additional test: where "fundamental rights" are involved, regulations limiting them are justified only if the state (or in this case, the municipality) can demonstrate that such regulations are necessary to promote a "compelling" governmental interest. *E. g.*, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).[10] The essential inquiry under this test is a dual one: Is there a "fundamental" right infringed upon? If so, is such infringement necessary to promote a "compelling" interest? I must confess that, when put through the filter of substantive due process, that test is really no test at all. Rather, it is a vehicle by which precious constitutional rights of the citizenry are thrown up to the fickle winds created by the whims of every life-tenured judge and justice across this nation, in derogation of the informed judgment of the elected legislative representatives of the people. *See* Griswold v. Connecticut, 381 U.S. 479, 507–527, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Black, J., dissenting); Furman v. Georgia, 408 U.S. 238, 405–414, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Blackmun, J., dissenting).

■ Be that as it may, I do not believe a physician and his abortion clinic have any "fundamental right" to be free from municipal regulations which exist for the sole purpose of guarding the physical health of his patients. Such is

8. The plaintiffs do not question whether this police power has been properly delegated to the Chicago Board of Health. In addition, it should be noted that the Illinois General Assembly has enacted statutes dealing with abortions. P.A. 78–225, S.H.A. ch. 38 § 81–11, et seq.; P.A. 78–226, S.H.A. ch. 91, § 16a; P.A. 78–227, S.H.A. ch. 111½, § 157–8.1. Each bill became effective on July 19, 1973. Together with the regulations issued pursuant to these laws by the Illinois Department of Public Health, they provide for substantially the same health and safety rules as do the abortion regulations of the Chicago Board of Health. Whether the power "delegated" to Chicago to issue abortion regulations has been preempted by the State is likewise not raised by the plaintiffs. Accordingly, that question is not decided at this time.

9. Williamson v. Lee Optical Co., 348 U.S. 483, 488–491, 75 S.Ct. 461, 99 L.Ed. 563 (1954); Barsky v. Board of Regents, 347 U.S. 442, 449, 74 S.Ct. 650, 98 L.Ed. 829 (1954); Graves v. Minnesota, 272 U.S. 425, 427–428, 47 S.Ct. 122, 71 L.Ed. 331 (1926); McNaughton v. Johnson, 242 U.S. 344, 348–349, 37 S.Ct. 178, 61 L.Ed. 352 (1916); Watson v. Maryland, 218 U.S. 173, 176–178, 30 S.Ct. 644, 54 L.Ed. 987 (1909); Dent v. West Virginia, 129 U.S. 114, 121–122, 9 S.Ct. 231, 32 L.Ed. 623 (1889); England v. Louisiana State Board of Medical Examiners, 263 F.2d 661, 671 (5th Cir. 1959); England v. Louisiana State Board of Medical Examiners, 246 F.Supp. 993, 996 (E.D.La. 1965), affirmed, 384 U.S. 885, 86 S.Ct. 1924, 16 L.Ed.2d 998 (1966).

10. For an enlightening discussion of this test in terms of substantive due process and the recent abortion decisions see Comment, In Defense of Liberty: A Look at the Abortion Decisions, 61 Geo.L.J. 1559 (1973).

the nature of the abortion regulations in this case. Accordingly, the defendants need not have a "compelling" interest in the instant case to regulate a doctor's practice of medicine. Rather, they need only show there is a rational relationship between the effect of the regulations and a legitimate interest in public health.

■■■ Plaintiffs assert in their complaint that defendants' regulations are "unrelated to the reasonable and vital needs and interests involved." Accordingly, they argue that they state a claim upon which relief may be granted. However, I am not convinced.

A close examination of the regulations indicates they are directed toward accomplishing a most legitimate, if not compelling governmental interest: preserving the health of all abortion patients regardless of the duration of their pregnancy. True, physicians performing abortions are selected from their profession to be subject to special regulations; but such discrimination is not unlawful when, as in this case, it is not arbitrary, unreasonable or unrelated to the governmental interests involved. It is clear, therefore, that the plaintiffs do not state a claim with regard to substantive due process or equal protection of the laws. Accordingly, defendants' motion to. dismiss the complaint must be granted as to those two allegations.

### 2. *Procedural Due Process*

Plaintiffs also contend that the abortion regulations deny them their right to procedural due process. Apparently,

their attack is directed toward the administrative procedures for granting and revoking registration, and the type of hearing which must be afforded upon revocation.

In substance,[11] the regulations enable the Chicago Board of Health to close down an abortion clinic which has failed to register or which is violating the health and safety rules contained therein. Written notice of such action must be served upon the owner or person in charge of the clinic. Upon proper registration or correction of the violations, the clinic may resume business. If the clinic wishes to challenge the action of the Board, it may request a hearing; and it will be scheduled within seven days of that request. The regulations fail to specify the format of the hearing.

Plaintiffs' allegation of denial of procedural due process raises two fundamental questions here: (a) Can a municipal board of health summarily order an abortion clinic to stop its operation for violation of local health regulations without granting a hearing prior to such action? (b) If so, what form must the eventual hearing take?

■■■ At the outset, it is recognized that the right to follow a chosen profession free from unreasonable governmental interference has long been considered to be "property" under the Constitution. *See, e. g.*, United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). This would include the

---

11. The pertinent sections of the regulations read as follows:

"XIX. *Closing Abortion Service*:

Whenever an inspection determines that an Abortion Service has failed to register in accordance with Section II(a) of these regulations or continued operation of such an Abortion Service would be found to be in violation of any of the sections of the Abortion Service Regulations, the Board of Health may direct the Commissioner of Health to order the discontinuance of operations until the Abortion Service is registered or until the Board of Health is satisfied that the violations are corrected,

such order shall be served in writing, personally upon the owner or person . in charge.

"XX. *Hearing*:

An Abortion Service served with an order to discontinue operations pursuant to Section XIX above, may request a Hearing before the Board of Health on said order of discontinuance in writing by serving said request on the Commissioner of Health, in person, or by certified mail, return receipt requested. The Board of Health or its designated Officer shall schedule a Hearing within seven (7) days of the receipt of such a request."

right to operate an abortion clinic; and it may not be denied without procedural due process of law. What "due process" requires in terms of time and format of an administrative hearing depends largely upon the urgency and weight of the governmental interest as compared to that of the person whose "property" rights are being infringed. Goldberg v. Kelly, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Concerning the issue of the timing of the hearing, it is well-recognized that drastic administrative action is often essential to eliminate public health threats which should not be allowed to exist prior to completion of formal proceedings. See K. Davis, Administrative Law Treatise § 7.08 at 438. Specifically, when a license is designed to provide control over a licensee for the protection of the public, and when an agency learns that the licensee is seriously endangering the public, the license may be suspended pending hearing on the question of revocation or restoration. Id. at 434. See also Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

There is ample authority upon which to base the conclusion that a local board of health may summarily close down an abortion clinic for violation of safety and health regulations. For example, in North American Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), the Supreme Court considered whether the Chicago Board of Health could seize stored food which had become putrid, and order the closing of the warehouse in which the food was located until it was seized without first granting the owner a hearing. The Court held that such administrative action did not constitute an unlawful taking of property without due process of law, in view of the fact that the public health might be endangered. Id. at 315, 29 S.Ct. 101. In Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), the Court upheld the action

of the Food and Drug Administration in seizing, without a hearing, an herbal medicinal preparation which had misleading labels. The Court specifically rejected the contention of the owner of the preparation that procedural due process required a pre-seizure hearing, saying:

"It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination

. . . .

"One of the oldest examples is the summary destruction of property without prior notice or hearing for the protection of public health . . . . A requirement for a hearing, as a matter of constitutional right, does not arise merely because the danger of injury may be more apparent or immediate in the one case than in the other . . . . That is a decision for Congress, not for us . . . . We cannot say that due process requires [a hearing] at that stage." Id. at 599–600, 70 S.Ct. at 873.

Furthermore, it has been recognized that in a "wide variety of situations," where harm to the public is threatened, and the private interest infringed is reasonably deemed to be of less importance, an official body can take summary action pending a later hearing. R. A. Holman & Co. v. SEC, 112 U.S.App.D.C. 43, 299 F.2d 127, 131 (1962), cert. denied, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962) (suspension of exemption from stock registration requirement does not mandate a pre-suspension hearing.) See also State Board of Examiners v. Weiner, 68 N.J.Super. 468, 172 A. 2d 661 (1961). One last example is that a restaurant may be summarily ordered to close down, if, upon inspection, the local board of health discovers that the kitchen and food storage areas are vermin-infested.

Such is the instant case. The Chicago Board of Health has exercised its discretion in the area of safety standards which must be maintained at

abortion clinics solely for the purpose of protecting the health of abortion patients. Surely, the health, indeed the lives, of abortion patients is of far greater importance than the right of plaintiffs to operate an abortion clinic free of all governmental interference. Therefore, I cannot believe that an abortion service which utilizes unsafe procedures and unsanitary instruments, and provides inadequate safety equipment should be permitted, as a matter of procedural due process, to continue its operation until the formal hearing process is concluded. Accordingly, it is concluded that plaintiffs' rights to be free of a taking of their "property" without due process of law are not violated by the power of the Chicago Board of Health to revoke their registration prior to a pre-revocation hearing.

■ The abortion regulations fail to specify the format of a hearing before the Board of Health. In determining the type of proceeding which must be afforded to satisfy the requirement of due process of law, the guiding light is this: the party adversely affected by agency action must be given an opportunity to be heard at a meaningful time and in a meaningful manner—given his education, sophistication and the nature of his rights involved. *See* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L. Ed.2d 287 (1970).

■ In light of this maxim and in the absence of contrary indications, I am confident that the following elements meet rudimentary due process requirements under the circumstances of the instant case, and that the Board of Health will not substantially deviate from them:

First, an order to terminate operations should not be issued against an abortion clinic unless the Board or its delegate finds there is probable cause to believe its regulations have been violated by that clinic.

Second, written notice of the order to cease operation, which is served upon an abortion clinic or its representative, should contain a detailed statement of all those facts upon which it was preliminarily concluded that the abortion regulations were violated.

Third, the owner or official in charge of the abortion clinic should be permitted to appear at the hearing, either personally or through retained counsel, in order to present his position orally and/or to submit briefs, affidavits and sworn testimony in support of his case.

Fourth, the abortion clinic representative should be permitted to hear all the evidence against him before having to put on his own defense; and he should have an opportunity to confront and cross-examine those adverse witnesses relied upon by the government.

Fifth, the government should have both the burden of producing evidence and the burden of persuading the decision maker by a preponderance of the evidence that the regulations were violated by the abortion clinic, in order to uphold the initial order to cease its operations.

Sixth, the findings of the decision-maker should rest solely on the law, the evidence adduced at the hearing and those matters which are officially noticed. Furthermore, he should comply with this requirement by stating in a written opinion the reasons for his determination and indicating the evidence and officially noticed facts he relied upon.

Seventh, the decisionmaker should be completely impartial; that is, he should not be connected in any significant way with the "prosecutional" branch of the Board of Health.

Eighth, a complete stenographic or mechanically produced record of oral proceedings should be kept so a party may request a transcript thereof for purposes of review.

The foregoing rules are, of course, only for the purpose of guiding the Board of Health in developing a format for its hearings with regard to abortion clinics. Furthermore, they are not to be considered as limitations on the procedural protections afforded members of

the medical profession who perform abortions. Indeed, the Board, City Council or even the State General Assembly may wish to promulgate procedural rules to govern this type of hearing. It is in this light that the foregoing elements of due process are set forth.

Assuming, as I must, that absent indications to the contrary, the Chicago Board of Health will not deny abortion clinics and their owners the right to procedural due process before their "property" is substantially impaired, and because summary agency action to close clinics which are reasonably believed to be in violation of the abortion regulations does not offend due process of law, defendants' motion to dismiss the complaint as to the issue of procedural due process must be granted.

### 3. *Vagueness and Overbreadth*

█ Plaintiffs also contend the abortion regulations are vague and overbroad, thus rendering them unconstitutional. Although the questions of vagueness and overbreadth frequently overlap, as in this case, their application is based upon different constitutional principles. Accordingly, they shall be treated separately.

██ The rule against vagueness involves the issue of whether the provisions of a statute are sufficiently definite to give reasonable notice of prohibited conduct to those who wish to avoid its penalties. A statute will be declared void for vagueness if it is so obscure that men of common intelligence must necessarily guess at its meaning and differ as to its applicability. *E. g.*, Cramp v. Board of Public Instruction, 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961). *See also* Landry v. Daley, 280 F.Supp. 938, 951 (N.D.Ill.1968).

█ The regulations in this case represent a twofold effort on the part of the Chicago Board of Health: first, to ensure that abortion patients will not be maimed or killed in ill-equipped "abortion mills"; and second, to tread as little and as lightly as possible upon a competent physician's exercise of his professional judgment in the treatment of his patients. Applying the rule against vagueness with these two observations in mind, it cannot possibly be said that, upon reading the abortion regulations, a physician with common knowledge of the procedures, equipment, drugs and dangers involved in the performance of abortions would *necessarily* guess at their meaning. True, they do not specify which drugs must be kept on hand at an abortion clinic, and they do not prescribe the color of the walls in the reception room. But the obvious reason for such omissions is that the Board believed it appropriate to leave certain matters to the discretion of a licensed physician. These regulations, therefore, do not violate the rule against vagueness; and plaintiffs do not state a claim upon which relief may be granted.

█ The prohibition against overbreadth primarily involves the issue of whether the language of the statute in question, given its normal meaning, is so broad that its sanctions may apply to conduct protected by the Constitution. Landry v. Daley, *supra*. The effect of overbreadth in a statute is to needlessly deter citizens from exercising their constitutional rights beyond that point which is necessary to protect the interests of the State.

█ In the present case, it cannot seriously be contended that the abortion regulations are overbroad. On the contrary, they merely require abortion clinics to provide a clean and safe medical service staffed by competent personnel. Furthermore, in no way do the regulations restrict the actual decision of doctor or patient to terminate a pregnancy. Accordingly, plaintiffs' contention that the regulations are overbroad must also be rejected. Defendants' motion to dismiss the complaint is therefore granted as to the issues of vagueness and overbreadth.

### B. *State Constitutional Questions*

Plaintiffs claim the same violations of the Illinois Constitution as they do that of the United States. For the same reasons that they do not state a federal claim upon which relief may be granted, so also do they fail to present a state claim. *See* Smith v. Department of Registration, 412 Ill. 332, 106 N.E.2d 722 (1952); Lasdon v. Hallihan, 377 Ill. 187, 192–193, 36 N.E.2d 227 (1941); Father Basil's Lodge v. City of Chicago, 393 Ill. 246, 256–257, 65 N.E.2d 805 (1946); City of Chicago v. Heffron, 346 Ill.App. 248, 253–255, 104 N.E.2d 846 (1952).

 In addition, however, plaintiffs contend that the abortion regulations unlawfully deprive them of their right to remedy and justice under Article I, Section 12 of the Illinois Constitution.[12] However, this claim must be considered in view of the fact that that provision is a statement of philosophy rather than a rule which can be used to solve cases. *See* Welch v. Davis, 342 Ill.App. 69, 95 N.E.2d 108 (1950), reversed on other grounds, 410 Ill. 130, 101 N.E.2d 547. Furthermore, it is absolutely clear that their right to remedy and justice is safeguarded by the procedure set forth in the regulations[13] as interpreted above.

It is concluded, therefore, that plaintiffs fail to present a claim upon which relief may be granted under the Illinois Constitution; and thus, defendants' motion to dismiss the complaint must be granted as to those issues.

### CONCLUSION

This court holds today that it has subject-matter jurisdiction of the instant case; that plaintiffs do not have standing to question whether the abortion regulations of the Chicago Board of Health violate the right to personal and marital privacy; that this case is not moot; and that the complaint fails to state a claim upon which relief may be granted under 42 U.S.C. § 1983, the United States Constitution, and the Illinois Constitution.

So ordered.

---

12. "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly."

13. *See* note 11 *supra*.

## APPENDIX "A"

WHEREAS the United States Supreme Court, in its recent decision, made abortions legal under specified conditions; and

WHEREAS it is not the intention of the Chicago Board of Health to determine the legality or appropriateness of abortions; and

WHEREAS the Board of Health of the City of Chicago is charged with the responsibility of protecting the health of all citizens of Chicago; and

WHEREAS numerous cases of injury, and even death, may result from the performance of abortions; and

WHEREAS the Chicago Board of Health has determined that it is necessary to establish appropriate regulations governing registration and operation of Abortion Services; now therefore

BE IT RESOLVED THAT THE CHICAGO BOARD OF HEALTH HEREBY AMENDS THE "HOSPITAL REGULATIONS FOR MATERNITY DIVISION, NEWBORN NURSERY DIVISION," AS ADOPTED AND AMENDED BY ADDING A NEW SECTION X TO SAID REGULATIONS TO BE TITLED "REGULATIONS FOR ABORTION SERVICES, CITY OF CHICAGO."

### CHICAGO BOARD OF HEALTH

#### ABORTION SERVICES

SECTION:

| | | |
|---|---|---|
| I | Definitions |
| II | Registration, Requirements and Standards |
| III | Filing of Staff and Service Regulations |
| IV | Records and Reports, Inspection |
| V | Compliance with Vital Statistics |
| VI | Facilities, Equipment and Supplies Generally |
| VII | Transportation Facilities for Abortion Affiliated Services |
| VIII | Elevators |
| IX | Admission and Examination Facilities |
| X | Laboratory Facilities |
| XI | Operating Facilities |
| XII | Recovery Room or Rooms |
| XIII | Staff: Physician in Charge of Abortion Service: Duties |
| XIV | Staff: Nursing Supervision of Abortion Patients |
| XV | Staff: Social Service |
| XVI | Admission and Examination Procedures |
| XVII | Rh Sensitization Prophylaxis |
| XVIII | Operative and Post-Operative Requirements |
| XIX | Closing Abortion Service on Order of Commissioner |
| XX | Hearing |

I. *Definitions*:

When used in these regulations:

(a) Abortion Service means a place or facility in which abortions are performed. There shall be two categories of Abortion Service:

(1) Hospital Abortion Service

(2) Affiliated Abortion Service

(b) Hospital means a hospital as defined in Chapter 137 of the Municipal Code, City of Chicago.

(c) Hospital Abortion Service means a licensed Chicago hospital in which abortions are performed.

(d) Affiliated Abortion Service means a place or facility in which abortions are performed not located in a licensed Chicago Hospital and which is located within a total transport time of fifteen (15) minutes from a licensed Chicago hospital with which such service has a written affiliation agreement for the treatment of its patients requiring care on an in-patient basis.

(e) Total transport time means the total elapsed time between the diagnosis, at an Affiliated Abortion Service, of a complication requiring emergency care and the delivery of the patient and the transfer of responsibility for the patient's care to appropriate medical personnel at a hospital.

(f) Qualified Obstetrician means:

(1) A licensed physician who is a diplomate of the American Board of Obstetrics and Gynecology; or who submits evidence to the Chicago Board of Health that his training and experience qualify him for admission to the examination by such Board; or

(2) A licensed physician who is a Fellow of the American College of Surgeons in the specialty of Obstetrics and Gynecology; or The American College of Obstetrics and Gynecology.

(3) A Doctor of Osteopathy who holds a license to practice medicine in the State of Illinois and who is certified by the American College of Osteopathic Obstetricians and Gynecologists, or who submits evidence to the Chicago Board of Health that his training and experience qualify him for admission to the examination by such Board, or who submits evidence of completion of an approved residency in obstetrics and gynecology.

(g) Qualified Surgeon means:

(1) A licensed physician who is a Diplomate of the American Board of Surgery, or who submits evidence to the Chicago Board of Health that his training and experience qualify him for admission to the examination by such Board; or

(2) A licensed physician who is a Fellow of the American College of Surgeons; a Doctor of Osteopathy who holds a license to practice Surgery in the State of Illinois and who is certified by the American College of Osteopathic

Surgeons, or who submits evidence to the Chicago Board of Health that his training and experience qualify him for admission to the examination by such Board or who submits evidence of completion of an approved residency in surgery.

(h) Registered Professional Nurse means a person who is registered as a registered professional nurse by the Illinois State Department of Education and Registration.

II. *Registration, Requirements and Standards*:

(a) No person shall maintain or operate or present himself as maintaining or operating an Abortion Service unless he has first registered such service with the Chicago Board of Health. Registration shall be made on forms furnished by the Chicago Board of Health and shall contain the information required therein. The Board of Health has the right of refusal to register any service that does not comply with the regulations of the Abortion Service. Any change in ownership, physician in charge, staff physicians, staff qualifications, extent of operations, location or affiliate hospital shall be reported to the Chicago Board of Health.

(b) An Abortion Service shall not in any advertisement announcement, letter, circular, poster or sign include any statement expressly or by implication, to the effect that such service is registered with the Chicago Board of Health or that it or its activities are or have been approved by the Chicago Board of Health.

(c) An abortion shall be performed only by a physician licensed to practice in the State of Illinois in an Abortion Service operated in accordance with the provisions of these regulations.

III. *Filing of Staff and Service Regulations*:

An Abortion Service shall be maintained in accordance with a set of formal standards which define the professional qualifications of its obstetric, gynecological, surgical, nursing and administrative staff, and which govern the conduct of the service. These standards shall be prepared by the physician in charge of such service and a copy of such standards and any change or modification thereof shall be filed with and approved by the Chicago Board of Health.

(Amended, June 20, 1973, by Chicago Board of Health)

IV. *Records and Reports, Inspection*:

(a) Each Abortion Service shall keep records including admission and discharge notes, histories, results of tests and examinations, nurse's work sheets, social service records, and other progress notes of patients, and it shall submit such records when the Chicago Board of Health shall so require.

(b) Each Abortion Service shall prepare a monthly report which shall be submitted to the Chicago Board of Health on forms prepared by the Chicago Board of Health not later than the

5th day following the end of the month. Such reports shall include the following:

(1) Number of patients requesting abortions

(2) Number of patients and age on whom abortions were performed according to the period of gestation and method of termination of pregnancy

(3) Number of patients for whom abortions were refused and the reasons therefor; and

(4) Number of patients referred to other abortion services

(5) Name and address of patients with a statement of complications following elective abortions describing the nature of the complication.

(c) A statement indicating informed consent in writing and a signed authorization for the performance of an abortion shall be obtained for each patient prior to the procedure.

V. *Compliance with Vital Statistics:*

Abortion Service shall comply with applicable requirements of the Department of Vital Statistics of the City of Chicago and the State of Illinois, which shall include the filing of a death certificate of each aborted fetus after the 20th week of gestation.

VI. *Facilities, Equipment and Supplies Generally:*

Facilities, equipment and supplies in an Abortion Service shall be maintained in proper working order. Necessary solutions, drugs and medications shall be supplied and maintained. Knee or foot controlled sinks shall be provided in or immediately adjacent to the room where the abortion is performed. The abortion service facilities and equipment shall be maintained in a clean and sanitary condition.

VII. *Transportation Facilities for Affiliated Abortion Service:*

An Affiliated Abortion Service shall have immediately available organized transportation facilities capable of insuring that a patient requiring emergency care at the hospital with which such service is affiliated will be transported to such hospital within the total transport time of fifteen (15) minutes.

VIII. *Elevators:*

Any building of more than one story in height and of which an Abortion Service is a part, shall be provided with an elevator for the use of non-ambulatory abortion patients. The elevator shall be of sufficient size to accommodate a standard stretcher. When a non-ambulatory abortion patient is moved from one floor to another, she shall be accompanied by attending medical personnel, or nursing personnel.

IX. *Admission and Examination Facilities:*

An Abortion Service shall provide facilities for registration, medical evaluation, examination and referral, and shall be equipped with suitable furnishings and accommodations, including waiting and dressing rooms and other appurtenances for the physical comfort and convenience of patients and personnel. Sufficient suit-

ably equipped examining rooms shall be provided for the daily caseload. Nothing contained herein prohibits registration, interviewing, history-taking, medical examination and appropriate referral from being conducted in an existing prenatal, gynecology and/or family planning clinic.

X. *Laboratory Facilities*:

(a) A Hospital Abortion Service shall have on its premises a blood bank, a clinical laboratory, and an X-ray laboratory. The clinical laboratory shall be qualified to perform urinalysis, hematocrit and other hematological tests including crossmatching and determinations of blood group and Rh type. The examination of surgically removed tissue, tests for pregnancy, and infrequently performed tests, or those not included within specialties or sub-specialties stated on its permit, or those requiring specialized equipment and skill, may be forwarded to another laboratory approved by the Chicago Board of Health.

(b) The affiliation agreement of an Affiliated Abortion Service shall include provision for use in the hospital of those facilities required in Subsection X(a). However, the Affiliated Abortion Service shall have on its premises such facilities as are necessary to perform clinical tests specified in the agreement.

XI. *Operating Facilities*:

(a) A Hospital Abortion Service shall have available on its premises a standard operating room capable of accommodating abdominal as well as vaginal surgical procedures.

(b) For abortions specified in Section XI(a), existing outpatient operating facilities may be utilized or new outpatient operating facilities created, if the policies established by the physician in charge of the Abortion Service and the patient load warrant. If it is found necessary to add to existing outpatient operating facilities, a standard sized treatment room may be converted to an operating facility.

(c) All rooms in which abortions are performed shall be adequately equipped, supplied and staffed and shall include the following in addition to the instruments and equipment needed for the performance of abortions:

(1) Anesthesia equipment and such other equipment as is necessary to treat patients for hemorrhage, shock, cardiac arrest, and other emergencies.

(2) A Hospital Abortion Service shall have an adequate supply of drugs, compatible whole blood, blood fractions, blood concentrates, plasma expanders and parenteral fluids immediately available at all times with appropriate refrigeration equipment therefor;

(3) An Affiliated Abortion Service shall have an adequate supply of drugs, plasma expanders and parenteral fluids which shall be available at all times with appropriate refrigeration equipment therefor;

 (4) Dressing room and scrub-up facilities which are suitably located:

 (5) A utility room with facilities for sterilization of supplies, except in an Abortion Service which receives sterile supplies from a central supply service.

 (6) A utility room for the cleaning of contaminated materials.

(d) The operating facilities and equipment shall be constructed and maintained so as to be free from sanitary hazards and safety hazards likely to cause a fire or explosion.

(e) Environmental controls to prevent infections, including the control of personnel and patient traffic, shall be maintained in the operating facilities.

XII. *Recovery Room or Rooms*:

An adequately sized and separate recovery room or rooms in proximity to the operating facilities shall be provided. The recovery room shall contain adequate monitoring equipment, suction, oxygen and other related equipment. Such room shall be staffed by qualified nursing personnel. An adequate number of recovery beds and/or rooms shall be provided to insure a minimum of one (1) hour for the recovery of each patient.
(Amended June 20, 1973, by Chicago Board of Health)

XIII. *Staff; Physician in Charge of Abortion Service; Duties*:

(a) An Abortion Service shall be staffed so as to provide on the premises adequate medical, nursing, and ancillary personnel.

(b) The Abortion Service shall be supervised by a physician in charge who shall be a qualified obstetrician or, in a service which does not have a qualified obstetrician, by a qualified surgeon.

(c) The physician in charge of the Abortion Service shall be responsible for:

 (1) Setting the standards filed with and approved by the Chicago Board of Health outlining policies and procedures pertaining to abortions and the implementation thereof; and

 (2) Designating a licensed physician or physicians whom he deems qualified to supervise directly the care of patients undergoing abortion, including their post-operative care and follow-up.

 (3) Establishing standards for the observation of patients by nursing personnel during the post-operative period.

(d) A physician shall be present on the premises of the abortion service at all times during the operative and post-operative period.
(Amended June 20, 1973, by Chicago Board of Health)

XIV. *Staff; Nursing Supervision of Abortion Patients*:

(a) At least one registered professional nurse with post-graduate education or experience in obstetric or gynecological nursing shall supervise and direct the nursing personnel and care and

shall be on duty in an abortion service at all times while in use.

(b) Student nurses, practical nurses, attendants and other ancillary personnel assigned to give nursing care in an Abortion Service shall be adequately trained in observation and emergency techniques for pre-operative and post-operative care of abortion patients and shall be under the direct personal supervision of a registered professional nurse at all times.

XV. *Staff; Social Service:*

An Abortion Service should have a social service unit available to serve its patients adequately.

XVI. *Admission and Examination Procedures:*

(a) Every woman seeking to terminate her pregnancy shall be registered as expeditiously as possible and, whenever possible, on the same day of registration shall be seen by a physician and staff for history taking, physical examination and necessary laboratory tests.

(b) The diagnosis of pregnancy shall be the responsibility of the examining physician.

(c) A complete medical history shall be obtained and the physical examination shall be complete and not confined solely to a pelvic examination. The following laboratory tests shall be performed on every patient: hematocrit, Rh factor, complete urinalysis, blood grouping by the blood bank in the event a cross-matching test for transfusion is required.

(d) Where medical evaluation, examination and referral are made from a private physician's office, hospital, clinic or other Abortion Service, pertinent records thereof shall be made available at the time the patient is registered and admitted to the Abortion Service. Proper policies and procedures for coordination or referral from various sources shall be established by the physician in charge of the Abortion Service and adhered to by all members of the staff.

(e) There shall be an interval of not less than twenty-four (24) hours between initial examination and termination of pregnancy to permit the reporting to and review of all laboratory tests by the examining physician and to permit and encourage thorough consideration and a firm decision by the patient regarding termination of pregnancy. No patient shall be coerced in any matter by the staff of the Abortion Service in arriving at her decision.
(Amended June 20, 1973, by Chicago Board of Health)

XVII. *Rh Sensitization Prophylaxis:*

Each Abortion Service shall provide Rh factor sensitization prophylaxis to all Rh negative patients according to standard medical procedures.

XVIII. *Operative and Post-Operative Requirements:*

(a) Abortions on patients with a gestation up to and including twelve weeks as determined by the physician may be per-

formed on an ambulatory basis in an abortion service if the patient's medical condition permits.

(b) The following patients shall be treated only on an inpatient basis for the abortion:

 (1) Patients pregnant more than twelve weeks as determined by the physician;

 (2) Patients having such medical, surgical, gynecological or psychiatric conditions or complications as specified in the rules of the chief of staff of the Abortion Service and filed with and approved by the Chicago Board of Health. (Amended June 20; 1973, by Chicago Board of Health)

(c) Only physicians shall be permitted to perform abortions. Termination of pregnancies involving more than twenty weeks gestation shall not be performed by the physician without appropriate medical consultation as required by the laws of the State of Illinois.

(d) Where general or local anesthesia is administered to abortion patients it shall be administered by personnel qualified by education and training.

(e) Pathologic examination of all tissue removed from the uterus shall be performed routinely.

(f) Patients shall receive the following post-operative care:

 (1) Patients whose pregnancy was terminated on an ambulatory basis shall be observed in the Abortion Service for a reasonable period of one hour to ensure that no immediate post-operative complications are present; (Amended June 20, 1973, by Chicago Board of Health)

 (2) Patients in an Affiliated Abortion Service in whom any adverse condition exists or in whom a complication is known or suspected to have occurred during or after the performance of the abortion shall be transferred and admitted to a back-up hospital. (Amended June 20, 1973, by Chicago Board of Health)

(g) Written instructions filed with, and approved by the Chicago Board of Health shall be issued to all patients in accordance with the rules of the physician in charge of the Abortion Service and shall include the following: (Amended June 20, 1973, by Chicago Board of Health)

 (1) Symptoms of complications to be looked for,

 (2) Activities to be avoided,

 (3) Specific telephone number to be used by the patient should any complication occur or question arise,

 (4) Date for follow-up or return visit after the performance of the abortion which shall be scheduled within two or six weeks as indicated by the condition of the patient,

 (5) Information on availability of family planning services when desired by the patient. When, in the opinion of the physician it is in the best interests of the patient, family planning services may be initiated, with the consent of the patient, prior to leaving the abortion service.

XIX. *Closing Abortion Service*:

Whenever an inspection determines that an Abortion Service has failed to register in accordance with Section II(a) of these regulations or continued operation of such an Abortion Service would be found to be in violation of any of the sections of the Abortion Service regulations, the Board of Health may direct the Commissioner of Health to order the discontinuance of operations until the Abortion Service is registered or until the Board of Health is satisfied that the violations are corrected, such order shall be served in writing, personally, upon the owner or person in charge.

XX. *Hearing*:

An Abortion Service served with an order to discontinue operations pursuant to Section XIX above, may request a Hearing before the Board of Health on said order of discontinuance in writing by serving said request on the Commissioner of Health, in person, or by certified mail, return receipt requested. The Board of Health or its designated officer shall schedule a Hearing within seven (7) days of the receipt of such a request.

May 16, 1973

## APPENDIX "B"

### CHICAGO BOARD OF HEALTH
### ABORTION SERVICE REGISTRATION FORM

I. Name of Facility: _____

Address: _____

Telephone Numbers:

Administration: _____

Patient Registration: _____

Patient Emergency: _____

II. TYPE OF FACILITY:

State whether facility is a hospital or an Affiliated Abortion Service; professional corporation; group or individual practice, other (specify):

_____

_____

III. AFFILIATION:

If facility is an Affiliated Service, attach a certified written letter or copy of agreement signed by the hospital administrator.

Name of Hospital Affiliate: _____

Address: _____

IV. TRANSPORTATION:

Specify arrangements for transportation to back up facility in event of an emergency:

_____

_____

_____

_____

V. OWNERSHIP:

A. Non-Profit: B. Proprietary:
 Church Operated: _____ Individual: _____
 Church Affiliated: _____ Partnership: _____
 Other Non-Profit: _____ Corporation: _____
 Other: (explain) _____

C. Date incorporated under the laws of the State of Illinois

_____

D. Owned By: _____

E. Operated By: _____
 (Name of Agency, Organization, Association, Corporation
 or Individual)

F. Official name of governing body: _____
 (i. e., Board of Trustees, Board of Directors, etc.)

H. Officers of the governing body (non-profit hospitals list
 officers of governing body. Proprietary facilities list
 name and address of individual owner, partners, or offi-
 cers of corporation.)

| | NAME | ADDRESS |
|--------------|------|---------|
| President: | | |
| Vice-President: | | |
| Secretary: | | |
| Treasurer: | | |

VI. ADMINISTRATION:

Administrator: _____ Title: _____

Date Appointed to Position: _____

Full Time _____ Part Time _____

If part time, what other position or employment: _____

_____

Training of Administrator:

_____

_____

VII. MEDICAL DIRECTOR:

Name: _____

Address: _____

 M.D. _____ D.O. _____

Location of other practices of Medical Director: _____

_____

Specialty Board Qualifications:

_____

_____

Is the Medical Director always present while abortions are being performed?

Yes: _____ No: _____

If no, who supervises: _____

Number of hours spent on premises of the abortion service by the Medical Director per week: _____

## VIII. MEDICAL COVERAGE:

Is there a licensed physician on the premises at all times patients are present? Yes: _____ No: _____

Name of Staff Members Performing Abortions:

| Name-Address of Private Practice | Status * | Specialty Board Qualifications and Certification |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

*Full or part time

Medical, Psychiatric and Other Consultants:

| Name-Address of Private Practice | Specialty Board Qualifications |
|---|---|
| | |
| | |
| | |
| | |

## IX. NURSING SERVICE:

Name of Person In Charge: _____

Title: _____

Current Illinois Registration Number _____

Training:

School of Nursing Graduate: Yes: _____ No: _____

University or college training: _____ Number of Years: _____

Degree in Nursing? _____ Other Degree? _____

Post-Graduate education in obstetrics and/or gynecology? _____

Date(s): _____ From what institution? _____

_____

Specify other experience in obstetrics and/or gynecology:

_____

_____

_____

X. DIRECTOR OF SOCIAL SERVICE:

 Name: _____

 Degrees: _____

_____

XI. RADIOLOGICAL SERVICE:

 Is Radiological Service provided in the facility: Yes___ No___

 Name of Physician in charge of service: _____

 Is he board certified? _____

XII. LABORATORY SERVICES:

 Is Laboratory Service provided in the facility? Yes___ No___

 If not, name affiliated hospital providing this service: _____

_____

 Name types of services provided: _____

_____

_____

 Name of person in charge of service: _____

 If board certified, name board: _____

XIII. BLOOD BANK SERVICE:

 Blood Obtained from:

 Commercial Blood Bank: _____

 Hospital Blood Bank: _____

 Volunteer Donors: _____

 Do you have the facilities to keep an adequate supply of blood on hand at all times? Yes_____ No_____

XIV. ANESTHESIA:

 Specify method of Anesthesia:

 Local_____ General_____ Other (Specify)_____

 Director of Anesthesiology: _____

 Qualifications of Director: _____

 Is the anesthesiologist on call? Yes_____ No_____

 If only on call, who administers anesthesia? _____

_____

_____

XV. EXTENT OF OPERATIONS:

Which floors of the facility will be occupied by the abortion service?

_____

Does the building have elevator service? Yes_____ No_____

In Patient Service:
 Number of Beds: _____
 Number of patients anticipated to be treated daily: _____
 Days and hours of operation: _____
 Number of Recovery Beds: _____

Out Patient Service:
 Number of rooms for abortion procedure: _____
 Number of Recovery Beds: _____
 Number of patients anticipated to be treated daily: _____
 Days and hours of operation: _____

XVI. PREGNANCY TESTING:

Required before registration: Yes_____ No_____
Required at time of examination: Yes_____ No_____
Specify type of test employed: _____

_____

XVII. PERIOD OF GESTATION ACCEPTABLE:

Under 10 Weeks_____ 10 to 12 Weeks_____ 13 to 15 Weeks _____ 16 Weeks and over _____

XVIII. PROCEDURES EMPLOYED:

Suction: _____ Dilatation and curettage _____
Hypertonic Saline _____ Hysterotomy _____
Other: (Specify) _____

XIX. SOURCES OF REFERRAL:

Specify all sources of referrals, giving proper street address and person in charge of Referral Service:

_____
_____
_____
_____

XX. PREVIOUS ACTIONS BY CHICAGO BOARD OF HEALTH:

| | Yes | No |
|---|---|---|
| Has the service ever been registered with the Chicago Board of Health? | _____ | _____ |
| Has the service been surveyed by the Bureau of Institutions and Medical Care Facilities, Chicago Board of Health? | _____ | _____ |
| Have blueprints of the abortion service ever been submitted to this Bureau for review? | _____ | _____ |

XXI. **COSTS:**

What are the approximate total charges to the patient for procedures performed at this facility?

Suction _____ Saline instillation _____

Hysterotomy _____ Dilation and
curettage _____

Other procedures (Specify procedure and cost) _____

_____

| Financial Data | Yes | No |
|---|---|---|
| Does this include the services of the physi- who performs the procedure? | _____ | _____ |
| Does patient pay cost of additional hospitalization if required for treatment of complications? | _____ | _____ |
| Is Rhogam included in total costs? If not, what additional charge made? | _____ | _____ |
| Is facility eligible for Medicaid reimbursement? | _____ | _____ |
| Are Medicaid patients accepted? | _____ | _____ |
| Are any uninsured patients served free of charge? | _____ | _____ |

XXII. **REPORTING:**

| | Yes | No |
|---|---|---|
| Is facility filing Certificates of Termination of Pregnancy—20 weeks or less with the Chicago Board of Health? | _____ | _____ |
| Is facility filing Abortion Report forms with the Chicago Board of Health? | _____ | _____ |

XXIII. **CONTRACEPTIVE COUNSELING:**

| | Yes | No |
|---|---|---|
| Is contraceptive counseling given? | _____ | _____ |

NOTE: Any change in ownership, physician in charge, staff physicians, staff qualifications, extent of operations, location or affiliate hospital shall be reported to the Chicago Board of Health.

SIGNED (Administrator) _____

MEDICAL DIRECTOR _____

DATE SUBMITTED _____